UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA   DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 8:15-cr-133-T-26MAP

PHILIP J. FARLEY III

## UNITED STATES' TRIAL MEMORANDUM

The United States of America, by and through the Acting United States

Attorney for the Middle District of Florida and the undersigned Assistant United

States Attorney and Department of Justice Trial Attorney for the Environmental

Crimes Section, submit this Trial Memorandum regarding several issues that may

arise during the trial, including 404(b) evidence:

## I.   FACTUAL BACKGROUND

### A.   Summary of the Charges

On November 2, 2016, a Grand Jury returned the second superseding

indictment charging defendant Philip J. Farley III with five counts of violating the

Clean Air Act, including one conspiracy count. This indictment narrowed the time

period of the charged conduct to April through December 2010 (and Aurelijius

Baltusis is no longer named as a defendant) from that charged in the original and

superseding indictment. The five charges in the second superseding indictment relate

to defendant's renovation of three multi-story 1970s apartment buildings, now

1

known as Urban Style Flats, located near downtown St. Petersburg, in Pinellas County. The buildings are associated with several addresses, but are generally known as the West Building (300 10th St, South), the North Building (305 Dr. Martin Luther King Jr. St, South, also known as 9th St, South), and the East Building (325 or 327 Dr. Martin Luther King Jr. St, South, also known as 9th St, South). Collectively, these buildings qualify as a "facility" for purposes of federal asbestos regulations.

All three buildings contained some amount of regulated asbestos-containing material" or "RACM", which is defined as friable asbestos material or non-friable asbestos-containing material that could become friable as a result of renovation activities. "Friable asbestos material" is defined as any material containing more than one percent (1%) asbestos that, when dry, could be crumbled, pulverized, or reduced to powder by hand pressure. Non-friable asbestos-containing materials may be regulated if they will be or have been subjected to sanding, grinding, cutting, or abrading.

Defendant is charged with violating the EPA-established "work practice standards" that an owner or operator must follow to ensure the safe and proper handling, removal, and disposal of asbestos during renovation work. 42 U.S.C. § 7412(h)(1). Count One charges that defendant failed to thoroughly inspect the facility for the presence of asbestos prior to the commencement of the renovation. Count Two charges that defendant failed to have a representative trained in compliance

with the NESHAP asbestos regulations present at his facility during the renovations, which lead to actions such as those in Charge Three, that defendant and his employees disturbed the asbestos and failed to remove and carefully lower the RACM to the ground. Count Four charges defendant with failure to deposit all asbestos-containing materials from his renovation as soon as was practical at a proper waste disposal site, or an EPA-approved site that converts RACM and asbestos-containing waste material into non-asbestos containing material. Count Five is a conspiracy count, charging that during an approximately one month period, defendant conspired with Aurelijius Baltusis, one of his supervisors, to violate the work practice standards for disposal of asbestos by knowingly directing workers to remove appliances contaminated with asbestos-containing debris from the interior of the buildings, and wash them outside with hoses, allowing the asbestos-contaminated debris into the ground outside the facility.

**B.**   **Statement of the Facts**

Urban Style Flats (USF), originally known as the Graham Park-Rogall Congregate, is a complex of three residential buildings containing 486 residential units located in St. Petersburg, Florida. The buildings were originally constructed and owned by the St. Petersburg Housing Authority (SPHA) as low-income and publicly-assisted housing. Graham Park was built in 1971 as a 15-story tower and a 10-story tower. Later, the 11-story Rogall building was added in 1978. The buildings are laid out in a horseshoe configuration, best described directionally as described

3

above (North, East, and West Buildings).

For various reasons, the Congregate was becoming obsolete for the needs of SPHA, who then explored demolishing, redeveloping, or selling the property since at least 2004. SPHA advertised the property for sale in 2009 and again in early 2010. Defendant, an experienced property developer, inquired about the property and toured it with SPHA staff on multiple occasions before making an offer to purchase the Congregate "as is" for $6.8 million, with an $800,000 nonrefundable deposit. Defendant planned to renovate the buildings into market-rate apartments. Defendant also formed the corporations Urban Style Flats LLC and PJF Urban Style Flats LLC to facilitate the purchase. On April 26, 2010, SPHA informed defendant that his offer had been selected over a competing bid.

Prior to signing the contract and beginning the renovation, defendant received two Phase I environmental reports, prepared in 2004, from SPHA (one for Graham Park, one for Rogall). The Phase I's noted that:

> "Due to the date of the construction of this buildings(sic) …, the possibility of the presence of Asbestos containing building materials exists.   In the process of our on site inspection there were no visual signs of delaminating ceilings or walls which may be asbestos containing observed. …If the potential existence of asbestos is of concern an asbestos survey should be performed by a properly certified Licensed Asbestos Consultant."

The reports concluded that "[e]xcluding the previously mentioned asbestos potential, we conclude that no additional environmental investigation is warranted on the study site at this time."

On May 14, 2010, defendant signed a copy of the sales contract, which stated

4

under the heading "As Is Where Is":

> Seller also acknowledges that Seller has informed the Purchaser that there is asbestos in the Property and Seller agrees to provide Purchaser with any current reports regarding asbestos in its possession.

During the negotiation of the sales contract in late April 2010, Jeffrey Butt, the attorney for SPHA, added a disclosure that there was asbestos in the buildings. The sales contract also stated that SPHA made no representations about the presence of hazardous substances, that defendant was relying solely on his own investigation of the property, and that defendant "was advised to conduct its own investigation regarding the existence of toxic or other environmental contamination." The Pinellas County "Property Appraiser Report" was also attached as an exhibit to the sales contract, and noted that the floors within the property consisted of "Vinyl Asb Tile."

The sales contract was structured to allow defendant until October 31, 2010, to come up with financing for the remainder of the $6.8 million purchase price. On May 14, 2010, Defendant also signed a lease for the West Building (Rogall) through October 31, which allowed him to begin work in that building immediately. Defendant later signed a four-month lease in July 2010 for access to the ground floor and common areas of the North and East Buildings (Graham Park).

Defendant began renovations immediately after signing the sales contract. Defendant did not obtain an asbestos survey of the areas to be renovated prior to commencing operations that would or did disturb asbestos-containing materials, despite federal and county requirements to do so. Defendant hired Julio

Macahuachi, who had painted defendant's house, to paint the interior and exterior of the 486-unit buildings. Defendant also instructed Macahuachi and his crew to smooth out ceilings by removing the popcorn texture material from them, which was found in nearly every ceiling in the facility. Defendant or his foremen hired several day laborers to assist with various tasks, including cleaning out garbage, light demolition, and scraping popcorn texture from the ceilings. On May 21, 2010, defendant was cited by the City of St. Petersburg for engaging in general contract work without a license, so defendant hired Ken Baxendell, a general contractor with experience building fences and seawalls, in case City inspectors returned. Baxendell joined the others in hauling trash from the units, and did not perform any meaningful general contractor duties until applying for a building permit in September 2010, around the time defendant verbally agreed that Baxendell would be general contractor of the West Building only.

Between May and November 2010, defendant directed or caused at least three crews to remove popcorn texture, vinyl floor tiles, fire doors, light fixtures, and other suspect asbestos-containing materials from facility components. Defendant, through his supervisors, directed the laborers to work throughout the facility, even though he did not have a legal right to access the units in the North and East buildings. The workers used metal scrapers or putty knives taped to the ends of wooden poles to scrape the texture material off of the ceilings. At first, the workers dry-scraped the material. Later, workers began to wet the ceilings by hosing them down and either

6

scraping the moistened material or allowing it to fall to the ground under its own weight. The workers let the material fall to the ground without carefully lowering it or containing it in any way, and generally conducted these scraping operations with the windows open. Other workers also used scraper and other tools to pry up vinyl floor tiles from the units, which would abrade the underlying mastic or glue and sometimes break the tiles themselves.

All texture materials, floor tiles, and other construction debris was put in one or more general waste dumpsters at the USF facility. These dumpsters were picked up regularly by the City of St. Petersburg Sanitation Department and taken to the Pinellas County Solid Waste Division (PCSWD). PCSWD is capable of receiving asbestos-containing waste materials and will deposit it accordingly if they receive adequate notice. However, defendant did not inform anyone that he was placing asbestos-containing materials in the dumpsters, so PCSWD categorized the material as "general waste," which generally goes to its incinerator. The ashes from the incinerator were then placed in the general landfill area.

On November 7, 2010, Ken Baxendell recommended to defendant that he obtain an asbestos survey. With defendant's consent, Baxendell called Angela Steward, a licensed asbestos consultant, to come and view the buildings. Steward thought this meant she was being asked to bid on a job. On November 8, 2010, Baxendell introduced Steward to defendant, who then took Steward on a tour of the facility. Steward saw workers in apartment units scraping the ceiling as described

above. Steward told defendant that there was probably asbestos in the buildings and recommended that he get a full asbestos survey. Defendant did not hire Steward or her firm at this time.

On November 16, 2010, Steward called the Pinellas County Air Quality Division (PCAQD) to report what she had seen at USF. Based on that report, Inspectors Chris Brodeur and Mickey Crane stopped by USF, where they met Baxendell. Baxendell told them that he was the general contractor for the West Building and showed them some of its completed units. Brodeur and Crane then left without conducting any further inspection of the property. After conferring with Steward again, Broduer returned to USF on November 18, 2010, and requested to see the full scope of the project. Baxendell took Brodeur to all floors of the West Building, where Brodeur saw floor tiles being removed by a crew of workers. Brodeur could also see white debris and dust everywhere. Baxendell contacted defendant, who gave Baxendell permission to show Brodeur the North and East Buildings. Upon entering those buildings, Brodeur saw significant amounts of popcorn texture debris, donned his respirator, and began taking samples. Brodeur also inspected the USF dumpster, saw suspect materials in it, and placed it on "hold" until it could be cleaned by a licensed abatement contractor. Brodeur recommended that they cease operations until a survey was completed. On November 22, 2010, defendant confirmed to Brodeur that he had instructed the painters to remove the popcorn texture and that Baxendell was not the general contractor for the North or

8

East Buildings.

Steward was immediately hired to conduct the survey after Brodeur's inspection on November 18, 2010. Steward took dozens of samples of various materials throughout all three buildings and sent them to Pinnacle Laboratories for analysis. Analysts at Pinnacle used visual estimation by polarized light microscopy and found greater than 1 percent asbestos in numerous building materials. In particular, the test results indicated that texture material on the ceilings in the older North and East Buildings contained asbestos, but the newer West Building ceilings did not. Steward conveyed the last of the completed surveys to defendant by December 3, 2010.

Based on the survey results, defendant hired ACT, an asbestos abatement firm, around December 1, 2010, to clean up the contaminated areas of the North and East buildings and contain or "encapsulate" the remaining areas of potential asbestos-containing materials. On December 2, 2010, Brodeur returned to USF to observe ACT's procedures and found additional popcorn texture debris at the facility. Brodeur took additional samples of this material. ACT worked at USF for approximately 10 days, but left temporarily when defendant withheld payment. From December 11 – 21, there was no certified asbestos abatement personnel at the site.

On December 20, 2010, PCAQD received a report that workers at USF were washing appliances from the facility outside on the loading dock. Brodeur went to

USF and saw appliances drying outside. Brodeur returned the next day and observed

two workers washing appliances on the loading dock. Brodeur saw at least one of the

workers on an upper floor inside the North Building, which by this time defendant's

survey from Steward had identified asbestos in the popcorn texture in this building.

Brodeur then saw the worker bringing an appliance out to be washed at the loading

dock.

Brodeur questioned the two workers, who stated that they had been told to

wash the appliances and to lie about their origin by Baltusis. Baltusis had instructed

the workers to say that the appliances were from the West Building, which did not

contain asbestos in the popcorn texture. Brodeur took samples from the popcorn

texture on the appliances, which was later confirmed to contain greater than one

percent asbestos. The next day, PCAQD inspectors Mickey Crane and Matt

McCann conducted a follow-up inspection and asked defendant about the origin of

the appliances. Defendant repeated that all the appliances being washed came from

the West Building.

After December 2010, PCAQD or Greenfield Environmental, an

environmental services firm retained by defendant, took additional samples from

materials at USF. All samples taken by PCAQD from November 2010 onwards were

sent to EPA's National Enforcement Investigations Center laboratory for analysis by

point-counting. That analysis confirmed the presence of greater than one percent

asbestos in 22 samples of various building materials at the facility. All samples taken

10

by Greenfield were sent to Air Quality Environmental for analysis. Air Quality Environmental point-counted the samples and confirmed that seven samples of popcorn texture contained greater than one percent asbestos.

### C. <u>Regulatory Background</u>

Asbestos is a listed hazardous substance and hazardous air pollutant. See 42 U.S.C. § 7412(b)(1) and 40 C.F.R. § 302.4. Medical science has established no minimum level at which human exposure to asbestos fibers is considered safe. 20 U.S.C. § 3601(a)(3). Because of its inherent danger, activities related to asbestos are highly regulated, at both the federal and state levels.

The Clean Air Act, 42 U.S.C. § 7413(c)(1), provides criminal penalties for any person who knowingly violates any requirement or prohibition of § 7412. Section 7412 provides for work practice standards governing asbestos renovation and demolition projects. 42 U.S.C. §§ 7412(b) and (h). Congress authorized the EPA Administrator to establish work practice standards as part of the Clean Air Act when it was not feasible to "prescribe or enforce an emission standard for control of a hazardous air pollutant." 42 U.S.C. § 7412(h). Based on this mandate, EPA established the National Emission Standard for Hazardous Air Pollutants or "NESHAP" work practice standards at Subpart M for the safe handling of asbestos-containing material during renovations and demolitions. 40 C.F.R. §§ 61.141 (definitions), 61.145, 61.150, and 61.154. <u>See</u> Second Superseding Indictment ¶¶ 7-9, 11-12 (setting forth and citing work practice standards); <u>see also</u> <u>United States v. Ho</u>,

311 F.3d 589, 594-96 (5th Cir. 2002); United States v. Weintraub, 273 F.3d 139, 144-46 (2d Cir. 2001).

For renovation activities involving asbestos, 40 C.F.R. § 61.145 contains three basic subsections (a-c). Subsection (A), entitled "Applicability," requires that an owner or operator of a renovation or demolition thoroughly inspect (i.e., survey) the facility prior to commencement to determine whether regulated asbestos containing material (RACM) in a jurisdictional amount is present, and if so, where and in what specific amounts. RACM is defined by the regulations to include all friable asbestos, as well as any Category I nonfriable asbestos (including floor covering and asphalt roofing materials) that has been or will be subjected to sanding, grinding, cutting, or abrading, and any Category II nonfriable asbestos (i.e., all other nonfriable asbestos containing material) that has a high probability of becoming friable as a result of the forces acting on the material in the course for the demolition or renovation. See 40 C.F.R. § 61.141 (definitions).

To be covered by the NESHAP regulations, a demolition or renovation project must involve a facility with at least 260 linear feet, 160 square feet, or, if the area could not first be measured, 1 cubic meter (35 cubic feet) of RACM to be disturbed or removed. See 40 C.F.R. §§ 61.145(a)(1)(i) and (ii), (4)(i) and(ii). Title 40, Code of Federal Regulations, section 61.145(b) entitled "Notification requirements," spells out the obligation of owners and operators to notify the EPA in writing 10 days prior to the commencement of renovation and demolition activities, which must

include a description of the facility, its location, the amount of asbestos to be removed, dates of anticipated work, analytical methods used to detect the presence of RACM, and work practices and engineering controls that will be employed to comply with NESHAP.

Title 40, Code of Federal Regulations, section 61.145(c) is entitled "Procedures for asbestos emission control." It establishes work practice standards that must be followed during renovation and demolition activities. Among other things, subsection (c) includes a requirement that all disturbed or removed RACM must be carefully lowered to the floor or to ground level, not dropped, thrown, or damaged or disturbed. 40 C.F.R. §§ 61.145(c)(2)(ii) and (6)(ii). The owner or operator must also have a representative trained in compliance with the asbestos regulations present during the renovation project, 40 C.F.R. § 61.145(c)(8).

Transportation and disposal of RACM is governed by regulations found at 40 C.F.R. § 61.150. RACM transported away from the facility must be marked with labels stating the name of the asbestos waste generator and the location where it was generated, and the owner or operator must maintain records regarding the shipment. 40 C.F.R. § 61.150(a)(1)(v) and (d)(1). Moreover, RACM transported off of the facility must be deposited as soon as practical as a disposal site authorized to accept asbestos, or an EPA-approved site that converts RACM and asbestos-containing waste material into non-asbestos containing material. 40 C.F.R. §§ 61.154, 61.155.

13

In addition to the above-referenced EPA regulations, state and local governments are permitted to develop and enforce their own air quality standards concurrently with the Clean Air Act emission standards, provided those standards are not less stringent than the federal ones. Those state and local governments often incorporate the federal asbestos work practice standards into their own air quality regulations, such as the Pinellas County Code, Section 58-145. The enforcement of asbestos removal regulations by a state or local authority does not prohibit EPA from enforcing any applicable federal emission standard or requirement. 42 U.S.C. § 7412(i).

There are a number of jurisdictional elements and definitions with the regulations. First, under NESHAP, the defendant must be the owner or operator of a renovation or demolition at a facility. An "owner or operator" is defined as "any person who owns, leases, operates, controls or supervises the facility being renovated or any person who owns, leases, operates, controls, or supervises the renovation operation, or both." The owner or operator's control over the renovation operation need not be sole or exclusive, in other words, he may share control with others. 42 U.S.C. § 7412(a)(9); 40 C.F.R. §§ 61.141, 61.145(a); Weintraub, 273 F.3d at 144-45. Furthermore, the definition makes clear that the regulations apply to the individual who owns or operates a renovation operation, not necessarily the owner or operator of the property. A "facility" is defined as any commercial or residential structure,

14

installation, or building. In order to be a facility, a residential building must have more than four dwelling units. 40 C.F.R. § 61.141. An "installation" means any building or structure or any group of buildings or structures of a single renovation site that are under the control of the same owner or operator. Id.

Second, the facility must have contained at least 160 square feet, 260 linear feet, or one cubic meter of regulated asbestos-containing material to be disturbed or removed. Weintraub, 273 F.3d at 144-45. "Regulated Asbestos-Containing Material" (or RACM), discussed above, means friable asbestos material and non-friable asbestos-containing material that has or will be subject to sanding, grinding, cutting, or abrading in the course of renovation activities. 40 C.F.R. § 61.141; Weintraub, 273 F.3d at 144-45. A material may be RACM if it contains more than one-percent of asbestos as determined using Polarized Light Microscopy. 40 C.F.R. § 61.141; Weintraub, 273 F.3d at 144-45.

## II.   LEGAL ISSUES

### A.   NESHAP Violations are General Intent Crimes

The Clean Air Act authorizes criminal prosecutions for knowing violations of the NESHAP work practice standards, making them general intent offenses. A knowing mental state "merely requires proof of knowledge of the facts that constitute the offense." Bryan v. United States, 524 U.S. 184, 193 (1998). Thus, specific knowledge that one's conduct is illegal is not required for an asbestos NESHAP

15

violation. For Count One, this means that the government must prove that the defendant knowingly failed to inspect the facility prior to commencing renovations. For the charges other than Count One, the government need only prove that defendant knew that the substance involved in the renovation was asbestos. United States v. Weintraub, 273 F.3d 139, 151 (2d Cir. 2001) ("because 'no one can reasonably claim surprise that asbestos is regulated and that some form of liability is possible for violating those regulations,' to sustain a conviction for violation of asbestos work-practice standards, the government need only prove that a defendant knew that the material being removed was asbestos"); see also United States v. Buckley, 934 F.2d 84, 88 (6th Cir. 1991) (stating that, "the statute requires knowledge only of the emissions themselves, not knowledge of the statute or of the hazards that emissions pose"); United States v. Alghazouli, 517 F.3d 1179, 1192-93 (9th Cir. 2008) (finding that section 7413(c)(1) of the Clean Air Act requires only that the defendant have knowledge of the facts that constitute the offense, and not that the defendant knew his acts were unlawful); United States v. Ho, 311 F.3d 589, 605-606 (5th Cir. 2002) (holding that defendant who knows of presence of asbestos may be convicted of knowingly failing to comply with Clean Air Act requirements, even if he or she is unaware of such requirements, because the term "knowingly" referred to knowledge of facts, not law).

**B.**   <u>**Evidence of Results of Air Monitoring**</u>

The government will not present any evidence on air monitoring for asbestos fibers at the USF facility. Evidence related to air monitoring is not relevant. Defendant is charged with violations of the NESHAP work practice standards. Congress authorized the EPA Administrator to establish work practice standards as part of the Clean Air Act when it was not feasible to "prescribe or enforce an emission standard for control of a hazardous air pollutant." 42 U.S.C. § 7412(h). Based on this mandate, EPA established the NESHAP asbestos work practice standards for the safe handling of asbestos-containing material. Accordingly, the amount of asbestos fibers in the air is not an element of any offense. The government must prove that the disturbed building materials contained greater than one percent asbestos. This can only be done by analyzing samples of the suspect building materials. There is no known method of using air monitoring to determine the asbestos content of building materials. Furthermore, because defendant chose to engage in renovations without the presences of a trained representative or any environmental consultant on site for the majority of 2010, there are no samples of any air monitoring results contemporaneous with that activity.[1]  Therefore, the evidence of results related to air monitoring do not make any fact related to any

---

[1] During the course of his renovation, defendant did not obtain air monitoring results until December 2010, when he hired M&A Technologies to conduct the asbestos survey. M&A provided this service by monitoring areas after they were abated to confirm its effectiveness.

17

element or defense more or less likely.

    **C.**   **Evidence of Asbestos Content**

The government intends to offer two types of evidence to prove the asbestos content of the building materials from defendant's facility; specifically, that samples of building materials were found to obtain greater than one percent asbestos as determined by point-counting by EPA and Air Quality Environmental (AQE), as corroborated by the visual estimation results from Pinnacle. All asbestos-testing was done using polarized light microscopy. Visual estimation, used by Pinnacle, is a faster, cheaper, and less precise way of estimating the asbestos content of a building material. It is the more commonly-used method by commercial laboratories due to its speed and lower costs. Defendant paid for testing by visual estimation when he hired M&A Technologies to survey the Urban Style Flats facility after November 19, 2010. Visual estimation is considered most reliable for materials that contain greater than 10 percent asbestos. If a sample contains that amount or more, EPA does not require any further analysis. See 40 C.F.R. § 61.141, "friable asbestos material."

Point-counting, as used by EPA and AQE, has been discussed at length in pretrial proceedings. It is also a method of visually estimating the asbestos content of suspect building materials. The EPA originally outlined its approved point-counting process in 40 C.F.R. Part 763, Subpart E, Appendix E. Appendix E describes a set of minimum requirements for procedural compliance, along with variations and

preferences that an individual analyst may adopt during testing. Furthermore, EPA has issued guidance since the original publication of Appendix E to clarify and improve those methods, such as how to analyze samples of spray-on texture material in a manner that conforms with EPA's purpose in regulating a hazardous substance. See 59 FR 3 (January 5, 1994); 60 FR 243 at 65243 (December 19, 1995).

The government also intends to introduce test results from samples taken after the charged timeframe to show that certain building materials contained more than one percent asbestos. The use of asbestos has been prohibited for decades, so there is no dispute that any asbestos-containing materials were placed in the building before defendant purchased it. The government will not offer any evidence to suggest that anyone, including defendant, was liable for the circumstances that generated the sample. For example, one sample from August 2012 was obtained after a water leak caused a bathroom ceiling to collapse at USF. The bathroom ceiling was covered in spray-on popcorn texture material. A sample of the debris was point-counted by AQE and reported as containing more than one percent asbestos. In other instances, some samples were taken as part of a later asbestos survey. These later samples corroborate the evidence that the same building materials seized around the time of the charges contained more than one percent asbestos, using the methods approved by EPA.

**D.** **Prior Conduct by SPHA**

The government anticipates that defendant will raise a number of defenses based the actions of SPHA as it relates to his purchase of the USF buildings. Defendant has provided the government with a report of a purported expert on "environmental matters" who will testify that, in his assessment, SPHA itself did not previously comply with state and federal NESHAP requirements, to suggest that this somehow exonerates defendant from his own violations. Defendant has also identified potential exhibits about prior renovation activities undertaken by SPHA in the years before defendant purchased the buildings. SPHA's compliance with NESHAP or any other regulation is irrelevant. SPHA is an entity of the State of Florida that provides low-income housing and services to residents of St. Petersburg. It is not an environmental or worker safety enforcement agency, so it is not a party to this federal prosecution. It had no involvement with defendant prior to his interest in purchasing the buildings. Therefore, its prior acts before engaging with defendant do not make any fact of any element more or less likely, nor does it provide helpful background or context to the jury. In fact, it will have the effect of confusing the jury with irrelevant conduct and unnecessarily drawing out the proceedings.

Nevertheless, defendant has indicated that he intends to assert that SPHA did not perform on the terms of the sales contract because it failed to provide him with an asbestos survey. Defendant has also indicated that he will confront SPHA

witnesses with documents showing that they were aware of the asbestos survey at some point prior to the sales contract, and had considered asbestos abatement costs during SPHA's exploration of options for renovating or demolishing the buildings. SPHA's prior acts with the building have no relevance to this case. In the sales contract, SPHA stated that asbestos was present in the facility, and would provide any asbestos survey currently in its possession to defendant. Defendant also explicitly acknowledged that he was relying on his own environmental inspections of the building and not on any representation by SPHA. SPHA did not provide a survey. Whether or not they had one in their possession, or should have turned one over, is a collateral issue with no relevance to the case at hand.

The government will introduce the sales contact to show that defendant had knowledge or notice that asbestos was present in the buildings as it relates to Counts Two – Four, but not as evidence that the materials in the building were actually RACM.[2] SPHA's compliance with the terms of the sales contract are not relevant to any element of any offense, and the government will object to this issue being raised during the examination of any witness. Otherwise, this case will turn into a civil contract dispute, and require lengthy explorations into the history of the asbestos survey, the properties and project it was used for, and its whereabouts at the time of

---

[2] Knowledge of asbestos is not a required element for Count One, the failure to inspect.

the sales contract, potentially adding days of testimony to this trial.

At the time of the contract negotiation, Jeffrey Butt, SPHA's attorney, inserted an asbestos disclosure in the contract not based on any specific knowledge other than the age of the buildings, his experience, and his review of the Phase I environmental reports. Defendant sent the draft contract to his brother, an attorney, who added a clause that SPHA would provide any environmental or asbestos-related reports. Butt further modified that clause to limit the disclosure to reports "currently" in SPHA's possession. At the time of the sales contract, SPHA did not have an asbestos report on the property in its possession. SPHA had a limited asbestos survey from 2004 in its possession at one time. Since 2004, SPHA had been in a joint operation agreement with Pinellas County Housing Authority in which they shared office space, personnel, and resources. However, during 2009, SPHA and PCHA split acrimoniously, which forced SPHA to find new accommodations for its staff. SPHA left or lost large volumes of documents when it vacated PCHA's offices. SPHA did not regain possession of the 2004 asbestos survey until January 2011, when it requested a copy from the original survey firm after an inquiry by PCAQD.

Federal Rule of Evidence 401 defines "[r]elevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." Fed. R. Evid. 401. In other words, for evidence to be relevant "(1) [t]he

22

evidence must be probative of the proposition it is offered to prove, and (2) the proposition to be proved must be one that is of consequence to the determination of the action." United States v. Glasser, 773 F.2d 1553, 1559 n.4 (11th Cir. 1985) (quotations omitted). If the evidence does not meet both of these relevancy requirements, then it is "not admissible." Fed. R. Evid. 402.

The 2004 asbestos survey is simply not relevant to this case at this point. First, regarding Count One, SPHA's contract performance does not alleviate defendant of his responsibility to adhere to the NESHAP requirements while he renovated the facility, especially his responsibility to obtain an asbestos survey of his own. It is not a fact in dispute that defendant failed to obtain a pre-renovation survey for the USF facility. SPHA's previous possession of one has no bearing on that fact. If defendant argues that he did not need an inspection because SPHA failed to give him one as promised, then he is seeking jury nullification, in that he should not be held responsible because of some wrong by SPHA or selective enforcement by the federal government.

Regarding Counts Two – Four, defendant may argue that SPHA's failure to provide the survey prevented him attaining the knowledge that asbestos was present in the facility. First, the disclosure in the sales contract affirmed the conclusion of the survey, namely that asbestos was present in the facility. Second, defendant may still reasonably argue that the pre-sale documents provided to him by SPHA only

identified asbestos in the floor tile and the pipe wrap, and that he did not intend disturb those during his renovation. This defense is available to him regardless of whether SPHA provided the 2004 asbestos survey. The government is not introducing or relying on that survey to suggest defendant's knowledge, so whether SPHA performed on that aspect of the contract is not relevant to prove or disprove such knowledge. The government has no evidence to show that defendant was specifically notified that asbestos was present in the popcorn texture before his purchase of the property. The absence of evidence about the 2004 asbestos survey will not impair defendant in any way, and will avoid the unnecessary and lengthy waste of time spent litigating over a contract dispute which defendant waived by the terms of the contract itself.

Because SPHA's contract performance is irrelevant, the existence of the 2004 survey does not affect any witness's credibility. No SPHA official has or will accuse defendant of knowingly violating any NESHAP requirement. No SPHA official will testify that he or she specifically informed defendant that there was asbestos in the popcorn texture material or that defendant inquired about that material. No SPHA official will testify that they did, in fact, provide defendant with the 2004 survey. Without any of these additional facts, defendant cannot argue that an SPHA official lied to him about the existence of the survey or lack thereof, and any knowledge of the survey by any SPHA official is redundant with the general warning about

asbestos in the sales contract.

Even assuming *arguendo* that SPHA's good faith performance on the contract has some iota of relevance, the government will further object because it appears to be a form of the defense of entrapment by estoppel. To assert the affirmative defense of entrapment by estoppel, a defendant must actually rely on some point of law offered by a government official and such reliance must be objectively reasonable. United States v. Funches, 135 F.3d 1405, 1407 (11th Cir. 1998). The notion that defendant knowingly failed to inspect the facility in reliance on SPHA's representations in the negotiations and sales contract is not objectively reasonable, given that a material condition of the sales contract was the "as is" clause. The contact also explicitly stated that the buildings contained asbestos and that defendant was relying on any "warranties, promises, understandings, or representations" by SPHA. Furthermore, the contract was signed by SPHA, an agency of the State of Florida. By contrast, this NESHAP enforcement action is being prosecuted by the federal government for violations of the Clean Air Act. Entrapment by estoppel is not available to a defendant claiming reliance on representations by state officials in a federal prosecution. Id. at 1406 (holding that the "defense of entrapment by estoppel when asserted as a federal crime, requires reliance on a misstatement by a federal official or agent of the federal government") (internal citations omitted).

### E.  Government's Rule 404b Evidence

#### 1.  Defendant's Other Uncharged Acts

Defendant have previously attempted to exclude the government's evidence potentially offered under Criminal Rule 404(b).[3]  The government proposes two specific acts by defendant which go to defendant's motive, intent, absence of mistake, and plan and should therefore be admitted as Rule 404(b) evidence in the government's case-in-chief.[4]  The government has previously provided notice of certain acts by defendant that are intrinsic to the charges, which is not required by any rule, but were provided with the Rule 404(b) notice in an abundance of caution.

Defendant's first act under Rule 404(b) is the renovation he directed at a 2-story commercial building that was attached to the USF facility. On or about April 22, 2011, defendant directed his employees to begin renovating this building by removing ceilings, walls, and flooring, without inspecting the building for asbestos. By this time, defendant had an asbestos survey for the facility but it did not include this 2-story building. On April 26, 2011, an employee of defendant discovered the

---

[3]Defendant has moved to exclude the government's 404(b) evidence (Dkt. 159), which the government opposed (Dkt. 161). The Court denied defendant's motions without prejudice (Dkt. 163).

[4]The defense has been provided early notice of these issues and provided full discovery on the issues.

work, shut it down, and immediately ordered an asbestos survey.[5]  Two days later, defendant then lied to PCAQD Inspector Chris Brodeur by telling him that the work had begun on April 26, the date of the survey. Brodeur later received an updated copy of the survey, which stated that it was completed after defendant had commenced renovations. All witnesses to this incident will already be testifying on other intrinsic matters in the government's case-in-chief.

The second act of the defendant offered under Rule 404(b) is his withholding of certain asbestos-related documents from BB&T Bank (BB&T) in early 2011, when defendant sought a new mortgage loan from BB&T. BB&T sent defendant a Commitment Letter on April 1, 2011, for the new mortgage, contingent on, among other things, proof that defendant was in compliance with various environmental requirements. For approximately the next six weeks, defendant was repeatedly asked by BB&T and others for information related to the scope of the asbestos problems at the facility. Defendant withheld this information from BB&T until just a days before the loan was set to close. On May 17, 2011, BB&T withdrew their mortgage offer to defendant because of his withholding of the documents showing the scope of his asbestos problems, causing defendant to lose part of his ownership stake in the property, per the terms of his original mortgage and its modifications.

---

[5]April 26, 2011, was a Monday.

### 2.   Legal Basis for Admission of Defendant's Other Acts

#### a.   Admissible Intrinsic Evidence

At the outset, certain evidence should be admissible as inextricably intertwined with the facts pled in this case. Evidence of criminal activity other than that charged in an indictment is not "extrinsic" under Rule 404(b) and thus falls outside the scope of the rule. Evidence that is intrinsic (not extrinsic) to the crimes charged includes: (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) evidence necessary to complete the story of the crime, or (3) evidence that is inextricably intertwined with the evidence of the charged offense. <u>Edouard</u>, 485 F.3d at 1344 (internal citations omitted). Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive, and set up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.[6] <u>United States v. McLean</u>, 138 F.3d 1398, 1403 (11th Cir. 1998) (citing <u>United States v. Williford</u>, 764 F.2d 1493, 1499 (11th Cir. 1985)). Since Rule 404(b) does not apply, the government must merely show that the evidence is relevant and more probative than prejudicial. Fed. R. Evid. 401 and 403.

---

[6] The government previously provided a description of a number of these intrinsic acts to defendant. <u>See</u> Government Letter, Dkt. 159, Exh. A.

### b.   Federal Rule of Evidence 404(b) Is a Rule of Inclusion

Federal Rule of Evidence 404(b) bars the admission of "evidence of other crimes, wrongs, or acts" for most purposes, but it allows their introduction "to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). "Rule 404(b) is a rule of inclusion" and "404(b) evidence, like other relevant evidence, should not be lightly excluded when it is central to the prosecution's case." United States v. Jernigan, 341 F.3d 1273, 1280 (11th Cir. 2003), citing United States v. Perez-Tosta, 36 F.3d 1552, 1562 (11th Cir. 1994). There are three essential criteria guiding the admission of 404(b) extrinsic evidence: (1) the evidence must be relevant to an issue other than the defendant's character, which can include motive, intent, opportunity, preparation, plan, identity, knowledge or absence of mistake, or accident; (2) there must be sufficient proof to enable the jury to find that the defendant committed the extrinsic act(s) in question; and (3) the probative value of the evidence cannot be substantially outweighed by undue prejudice. United States v. Edouard, 485 F.3d 1324, 1344 (11th Cir. 2007).

Naturally, "[a]ll evidence which tends to establish the guilt of the defendant is, in one sense, prejudicial to that defendant." United States v. Terzado-Madruga, 897 F.2d 1099, 1119 (11th Cir. 1990) (internal quotation and citation omitted). Damaging or prejudicial evidence should not be excluded on that ground, however; it is only when evidence is unfairly prejudicial, specifically, when the prejudice of

evidence "substantially outweigh[s]" its probative value, that the evidence must be excluded. Id. "Exclusion under Rule 403 is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility." United States v. Troya, 733 F.3d 1125, 1131-32 (11th Cir. 2013) (internal quotation and citations omitted).

### 3.   Defendant's Acts Are Relevant and Admissible Extrinsic Evidence to Show His Intent, Knowledge, and Lack of Mistake or Accident

The government's proposed 404(b) evidence goes directly to the defendant's intent, knowledge, or absence of mistake in committing the charged crime. The Eleventh Circuit has approved similar uses of 404(b) evidence on multiple occasions. As the Eleventh Circuit has explained, "the relevancy of the extrinsic offense derives from the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses. The reasoning is that because the defendant had unlawful intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense." United States v. Parr, 716 F.2d 796, 804 (11th Cir. 1983) (citation omitted).

Defendant's failure to inspect the attached 2-story building before renovating it is relevant evidence of his state of mind at the start of the charged timeframe. Despite being informed of the presence of asbestos in the sales contract and in the Phase I reports, among other places, defendant knowingly failed to inspect his facility before

30

commencing renovations in May 2010. By April 2011, defendant had already been

inspected by PCAQD, paid for an asbestos survey, and hired an abatement

company, but by ordering work to commence over a weekend, he attempted to evade

the hassle and costs associated with compliance. Once again, without regard for the

rules, regulation, or health risks associated with asbestos, defendant did the exact

same thing as the offense charged in Count One. This evidence is probative of

defendant's state of mind in May 2010 of his intent to act without regard for any

precaution or standard associated with asbestos regulation. See United States v.

Delgado, 56 F.3d 1357, 1366 (11th Cir. 1995) (holding that an extrinsic conviction

with the same elements as a charged crime is relevant to show state of mind); see also

United States v. King, 195 Fed.Appx. 867 (11th Cir. 2006) (holding that defendant's

post-indictment possession of marijuana was relevant to issue of intent to the charged

conspiracy to distribute marijuana). Furthermore, this evidence tends to prove that

defendant acted with knowledge and did not make an innocent mistake by starting

renovations without conducting a survey.

     Defendant's withholding of information from BB&T is also evidence of his

knowledge, intent, and lack of mistake. It tends to show that defendant's state of

mind throughout the charged timeframe in Counts One – Four that asbestos

concerns were secondary to his financial pressures. See Parr, *supra*, at 804. From the

start of his renovation, defendant did not want to incur the significant cost and time

delay that proper asbestos abatement would require. The government will present evidence that even after defendant hired an abatement company in late November 2010, he failed to pay them on time, which lead to the conduct in Count Five, when untrained workers were washing contaminated appliances because the abatement company was no longer on site. In the incident with BB&T, defendant again showed a disregard for the severity of asbestos and its related problems, as he had previously in his comments to Steward. This evidence further shows that it was no accident that defendant did not report the asbestos violations to BB&T; instead, defendant had the intent to deceive others about his handling of asbestos, which is the underlying motive and intent his false statement to PCAQD inspectors, as alleged in Count Five, Overt Act (c).

### F. <u>Non-hearsay Statements</u>

#### 1. Adoptive Admissions

The government will offer into evidence the asbestos surveys procured by defendant from M&A Technologies after November 18, 2010. These documents should be admitted as adoptive admissions because defendant commissioned, maintained, and acted upon these surveys. Federal Rule of Evidence 801(d)(2)(B) states that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is a statement of which the party has manifested an adoption or belief in its truth." The "adoption by use" theory suggests that if information is presented to the defendant by a third party, and the defendant then uses the information, the

defendant has manifested an adoption or belief in its truth.

In White Industries, Inc. v. Cessna Aircraft Co., 611 F. Supp. 1049, 1062 (W.D. Mo. 1985) the court stated that "[t]here is no doubt that where a party's use of a document supplied by another in fact represents the party's intended assertion of the truth of the information therein, an adoptive admission can be found." The court noted that the adoption of third-party information requires that the party acted in "some significant, identifiable way in direct reliance upon the specific information in question, so as to demonstrate clearly the party's believe in and intentional adoption of that information." Id. at 1063 (emphasis omitted). The court emphasized that "such a finding will most often be possible where the party has actively requested or sought out the specific information in question." Id.

The government must only show "by implication that business was conducted in a fashion that the statement was adopted." Penguin Books, U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd., 262 F. Supp.2d 251, 259 (S.D.N.Y. 2003) (citing Pekelis v. Transcon. & W. Air, Inc., 187 F.2d 122, 128 (2d Cir. 1951)). An adoptive admission can also be found where a "party forwards a document to another in response to a request for information contained in the document." Tracinda Corp. v. DaimlerChrysler AG, 362 F. Supp.2d 487, 500 (D. Del. 2005); Penguin Books, 262 F. Supp.2d at 259.

A party may also "adopt a written statement if the party uses the statement or takes action in compliance with the statement." Weiss v. Allstate Ins., Inc., 512 F. Supp. 2d 463, 470 (E.D. La. 2007). In Weiss, the court held that if the plaintiffs can

show that the defendant insurance company requested an engineering report and then acted on it to pay a third-party's insurance claim, the report would be excepted under Rule 810(d)(2)(B). Id. Where "the facts give rise to conflicting but plausible inferences" concerning a party's adoption of a statement, the resolution of the conflict is a question for the jury. United States v. Duval, 496 F.3d 64, 76 (1st Cir. 2007).

Based on the M&A Technology surveys, defendant took actions which suggested that he took the results of those analyses as true and accurate. Defendant ceased renovation operations after the survey began and then hired an abatement company to clean the asbestos contamination throughout the USF facility. At no point in his subsequent dealings with other consultants, asbestos abatement contractors, PCAQD personnel, or his business partners did he disclaim the conclusions of the asbestos surveys as to the amount and location of asbestos-containing materials at USF. Thus, the M&A Technologies surveys and the information they contain about the amount and location of chrysotile asbestos should be admitted as adoptive admissions of defendant.

## 2. Admission of E-mails

The government will offer into evidence a number of e-mails from defendant to other people. The United States will seek to authenticate these e-mails under Fed. R. Evid. 901. Many of these e-mails will contain statements of defendant, which are not hearsay. Fed. R. Evid. 801(d)(2). These e-mails and e-mail strings should be admitted in their entirety.

Under Fed. R. Evid. 901, documents may be authenticated by "evidence sufficient to support a finding that the matter in question is what its proponent claims." Documents may be authenticated through "appearance, contents, substance, internal patterns, or distinctive characteristics taken in conjunction with circumstances." Fed. R. Evid. 901(b)(4); United States v. Siddiqui, 235 F.3d 1318, 1322-23 (11th Cir. 2000) (finding proper authentication where the e-mails bore the defendant's e-mail address; the same address appeared on e-mails sent to the defendant; when the recipient replied to the e-mail using the e-mail program's reply function, the reply was sent to the defendant's email address; the content of the e-mail suggested that it was authored by the defendant; and the e-mail referred to its author by his nickname.)

However, while certain portions of the e-mails and e-mail strings may contain out-of-court statements by a third-party declarant, the mere fact that a communication contains such a statement does not make that statement hearsay. Pursuant to Fed. R. Evid. 801(c), "hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(a) defines a "statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Thus, there are two requirements for an out-of-court utterance to be classified as hearsay: (1) the utterance must be an assertion of some factual matter; and (2) it must be offered to prove the truth of the matter it asserts.

35

See United States v. Cruz, 805 F.2d 1464, 1477-78 (11th Cir. 1986).

Accordingly, an out-of-court statement is not subject to a hearsay objection unless it contains an assertion of some fact which can be true or false. In Cruz, the Eleventh Circuit held as an alternate ground that the statement at issue was not hearsay because it was not a statement of some fact. "It is more in the nature of an order or a request and is, to a large degree, not even capable of being true or false." Cruz, 805 F.3d at 1478. See also United States v. Shepherd, 739 F.2d 510, 514 (8th Cir. 1984) (stating an instruction by its nature is "neither true nor false and, thus, cannot be offered for its truth"). Questions and commands would fall into that same category of non-assertions of fact. As for the second requirement, also excluded from hearsay would be any verbal or non-verbal conduct containing an assertion of fact when it is offered as a basis for inferring something relevant other than the matter asserted.

There are three major alternative purposes for offering a statement that contains an assertion of fact which would permit the admission of the statement as non-hearsay. The first alternative purpose for offering a statement which might contain an assertion of fact is "context." See United States v. Price, 792 F.3d 994, 997 (11th Cir. 1986). In particular, chains of e-mail communications from third parties are not hearsay when used to provide context for a defendant's messages. United States v. Dupre, 462 F.3d 131, 137 (2d Cir. 2006) (finding that where a statement in an e-mail is deemed admissible as an admission by a party opponent

36

under Fed. R. Evid. 801(d)(2)(A), the surrounding e-mail chain statements which provide essential context may also be admitted as context). A second alternative purpose for offering a statement is "effect." United States v. Horton, 847 F.2d 313, 324 (6th Cir. 1988) (citing United States v. Herrera, 600 F.2d 502 (5th Cir. 1979)). An out-of-court statement may be used to show a defendant was on notice of a particular matter, which notice should have produced a certain effect. See Biegas v. Quickway Carriers, Inc., 573 F.3d 365, 379 (6th Cir. 2009). Also, the Eleventh Circuit relied principally on the "effect" theory of admissibility in Cruz. See Cruz, 805 F.2d at 1478. A third alternative purpose for offering a statement is prove "knowledge" of the defendant by showing that he was aware of what was said, as opposed to proving the truth of the matter asserted. See United States v. Cancelliere, 69 F.3d 1116, 1118-19, 1122-23 (11th Cir. 1995) (holding that statements in a letter written to defendant by his father were not hearsay when offered to show that defendant charged with false statements to a bank was aware of the facts that made the statement false).

Additionally, the government may seek to introduce e-mails as business records. Rule 803(6) allows for the admission of business records where four criteria have been satisfied: (1) the records were made in the course of regularly conducted business activities; (2) the records were kept in the regular course of business; (3) it was the regular practice of that business to have made the records; and (4) the records were made by a person with knowledge of the transaction or from

information transmitted by a person with knowledge. United States v. Bueno-Sierra, 99 F.3d 375, 378-79 (11th Cir. 1996); United States v. Cecil, 615 F.3d 678, 690 (6th Cir. 2010)).

The foundation for the business record exception "may be supplied by a custodian of records or 'other qualified witness' who has no personal knowledge regarding the creation of the document." United States v. Kail, 804 F.2d 441, 448 (8th Cir. 1986). "The phrase 'other qualified witness' should be given the broadest interpretation; he need not be an employee of the entity so long as he understands the system." Unites States v. Pelullo, 964 F.2d 193, 201 (3d Cir. 1992) (citing Weinstein's Evidence ¶ 803(6)[02]); United States v. Franco, 874 F.2d 1136, 1139-40 (7th Cir. 1989); United States v. Hathaway, 798 F.2d 902, 906 (6th Cir. 1986).

To establish the foundation under Rule 803(6), it is not required "that the records be prepared by the business which has custody of them." United States v. Parker, 749 F.2d 628, 633 (11th Cir. 1984)(citation omitted). Indeed, in Parker, the Eleventh Circuit upheld the admissibility of a business record even though the qualifying "witness and his company had neither prepared the . . . [record] nor had first hand knowledge of the preparation . . ." Id. The foundational requirements for Rule 803(6) may also be established by circumstantial evidence, or by a combination of direct and circumstantial evidence. Itel Capital Corp. v. Cups Coal Co., Inc., 707 F.2d 1253, 1259 (11th Cir. 1983); Parker, 749 F.2d at 633. Such evidence may come in many forms, including documentary evidence, affidavits, admissions of the

parties, and even the document itself. <u>Pelullo</u>, 964 F.2d at 201.

### 3.  <u>Co-conspirators Statements under FRE 801(d)(2)(E)</u>

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if made by a co-conspirator of a party during and in furtherance of the conspiracy. <u>United States v. Diaz</u>, 248 F.3d 1065, 1087 and n.21 (11th Cir. 2001). When seeking to offer a statement of a co-conspirator into evidence pursuant to Rule 801(d)(2)(E), the government must first establish the following by a preponderance of the evidence: (1) that a conspiracy existed; (2) that the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) that the statement to be introduced was made during the course and in furtherance of the conspiracy. <u>See Bourjaily v. United States</u>, 483 U.S. 171 (1987); <u>United States v. Dickerson</u>, 248 F.3d 1036, 1049 (11th Cir. 2001).

To connect the defendant to a conspiracy, the prosecution must demonstrate that the defendant agreed with others to join in the conspiracy and participate in the achievement of an illegal objective. <u>Grassi</u>, 616 F.2d at 1301. Direct evidence is not required to connect a defendant to a conspiracy. <u>United States v. Guida</u>, 792 F.2d 1087, 1097 (11th Cir. 1986).   Establishing a connection to a conspiracy may be done by combining evidence of knowledge and association with other circumstantial evidence. <u>Id.</u>

Among other requirements, the statement to be admitted must be "in furtherance of the conspiracy" in order to be covered under the hearsay exclusion in Rule 801(d)(2)(E). While Rule 801(d)(2)(E) requires that the co-conspirator statement be "in furtherance" of the conspiracy, the concept of "in furtherance" is a broad and flexible one, and allows for the admission of many different types of statements. In fact, the Eleventh Circuit applies "a liberal standard in determining whether a statement is made in furtherance of a conspiracy." United States v. Santiago, 837 F.2d 1545, 1549 (11th Cir. 1988); see also United States v. James, 510 F.2d 546, 549 (5th Cir. 1975) (applying the phrase "in furtherance of the conspiracy" too strictly defeats the purpose of the exception). In other words, the out of court statement need not be necessary to the conspiracy; it must only further the conspiracy. See United States v. Caraza, 843 F.2d 432, 436 (11th Cir. 1988). Defendant's co-conspirator Baltusis made such statements as alleged in the overt acts of Count Five, in which he directed workers to clean contaminated appliances and to lie to PCAQD inspectors about the origin of those appliances to disguise the fact that they were covered in asbestos-containing material.

### G.   Use of Witness Interview Summaries

Most, if not all, of the government witnesses have previously spoken to EPA CID agents in the course of this investigation. EPA CID agents summarized the

contents of those interviews on OCEFT Form 3-01 Investigative Activity Reports
(IARs). Inspectors from the PCAQD also summarized statements of witnesses
interviewed during the course of their investigation. All of these IARs and similar
reports were provided to defendant in May 2015. These IARs and other reports are
not written or adopted statements of the witnesses and are not verbatim transcripts of
those interviews. As such, the summaries are not statements of the person
interviewed under the Jencks Act, which defines a statement as "a written statement
made by said witness and signed or otherwise adopted or approved by him"; a
recording or transcription that "is a substantially verbatim recital of an oral statement
made by said witness and recorded contemporaneously"; or a statement made by a
witness to the grand jury. 18 U.S.C. § 3500(e)

This places limits on defendant's use of the contents of those prior
summarized interviews; specifically, defendant should be barred from introducing
the contents of the summaries to impeach witnesses during cross examination,
publishing the contents of the summaries to the jury, or otherwise suggesting to the
jury that the summaries are statements of the witnesses who did not write them or
adopt them. Such limitations are consistent with the law and rules of evidence. In
Palermo v. United States, the Supreme Court held that it would "be grossly unfair to
allow the defense to use statements to impeach a witness which could not fairly be
said to be the witness' own rather than the product of the investigator's selections,
interpretations, and interpolations." 360 U.S. 343, 350 (1959).

Defendant is, of course, free to ask a witness whether he or she made a

statement that is reflected in an interview summary.[7]  However, if defendant is not satisfied with the witness's answer, defendant may not publish or introduce the contents of the summary as a prior inconsistent statement. See United States v. Brika, 416 F.3d 514, 529 (6th Cir. 2005) (holding that documents not attributable as witness statements "have been deemed inadmissible for impeaching witnesses on cross-examination"); United States v. Leonardi, 623 F.2d 746, 757 (2d Cir. 1980) (holding that because "the written statement of the FBI agent was not attributable to [the witness]" it was "properly rejected as a prior inconsistent statement"); United States v. Hill, 526 F.2d 1019, 1026 (10th Cir. 1975) (upholding the trial court's decision to "not allow counsel to use the [FBI] 302 statement to impeach a witness because the witness did not prepare or sign the document and probably never adopted it"). Moreover, defendant may not use such a witness summary in a way that suggests to the jury that it is a statement of the witness. See United States v. Mfarks, 816 F.2d 1207, 1210-11 (7th Cir. 1987) (holding that where defense counsel read from an agent's witness summary during cross-examination in a way that would "seem authoritative" and potentially confuse the jury, the judge was entitled to require the witness be shown the summary and given the opportunity to adopt or reject it as a statement, although such a practice was no longer required by the federal rules of evidence).

---

[7] Likewise, in the appropriate circumstances and with the proper foundation, the defense may attempt to refresh the witness's recollection by showing the witness the summary, but only if the defense does so in a manner that does not imply that the summary is the witness's own statement.

Respectfully submitted,

W. STEPHEN MULDROW
Acting United States Attorney

By: _s/ Thomas Franzinger_              _s/ Kelley C. Howard-Allen_
THOMAS FRANZINGER                    KELLEY C. HOWARD-ALLEN
Trial Attorney                                Assistant United States Attorney
DC Bar #1005000                          Florida Bar No.: 0085464
Env. & Nat. Resources Division      400 North Tampa Street, Suite 3200
U.S. Department of Justice            Tampa, Florida 33602
Washington, DC 20004                 Telephone: (813) 274-6000
Telephone: 202-305-0458             Facsimile:   (813) 274-6103
Facsimile: 202-514-8665             E-mail: kelley.howard@usdoj.gov
E-mail:thomas.franzinger@usdoj.gov

**U.S. v. FARLEY**                           **Case No. 8:15-cr-133-T-26MAP**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 28, 2017, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following:

By: *<u>s/ Thomas Franzinger</u>*
THOMAS FRANZINGER
Trial Attorney
DC Bar #1005000
Env. & Nat. Resources Division
U.S. Department of Justice
Washington, DC 20004
Telephone: 202-305-0458
Facsimile: 202-514-8665
E-mail:thomas.franzinger@usdoj.gov